IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WAKEFIELD KENNEDY, LLC, a Washington limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> D. SHANE BALDWIN, an individual, MARK STAPLES, an individual, SILVERLEAF FINANCIAL 9, LLC, a Utah limited liability company, SILVERLEAF FINANCIAL LLC, a Utah limited liability company, METRO NATIONAL SETTLEMENT SERVICES, LLC, a Utah limited liability company, and STATE CAPITAL HOLDINGS, LLC, a New York limited liability company, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [193] STATE CAPITAL HOLDINGS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING [210] WAKEFIELD KENNEDY, LLC's MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 11-cv-00604-DN-EJF <br><br> District Judge David Nuffer <br> Magistrate Evelyn J. Furse |
| STATE CAPITAL HOLDINGS, LLC, a New York limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> SILVERLEAF FINANCIAL 9, LLC, METRO NATIONAL SETTLEMENT SERVICES, LLC, D. SHANE BALDWIN, MARK STAPLES, SILVERLEAF FINANCIAL, LLC, and WAKEFIELD KENNEDY, LLC, <br><br> Defendants. | |

## CASE OVERVIEW

This consolidated case is a dispute between parties to two successive transactions:

      A.     Loan document sale: Silverleaf Financial 9, LLC, ("Silverleaf") owned a note and mortgage (and other related documents hereinafter referred to as the "Woodland Mall Loan Documents") which it contracted to sell to State Capital Holdings, LLC ("State Capital"). The documents were delivered into escrow held by Metro National Settlement Services, LLC ("Metro").

      B.     Loan documents pledged: After the Woodland Mall Loan Documents were in escrow with Metro for the Silverleaf-State Capital sale but before that deal closed, Silverleaf pledged the same Woodland Mall Loan Documents as security for a loan from Wakefield Kennedy, LLC ("Wakefield"). State Capital had no actual notice of this loan or pledge. Metro (which had possession of the Woodland Mall Loan Documents) agreed to "continue to hold" the documents for the benefit of Wakefield and not to release them until the Wakefield-Silverleaf loan was paid.

In late 2010, State Capital paid its purchase price into escrow with Metro. Acting on instructions from Silverleaf, Metro disbursed the purchase money to Silverleaf. Consequently, the Wakefield-Silverleaf loan remains unpaid.

State Capital and Wakefield each seek delivery of the Woodland Mall Loan Documents. This order GRANTS State Capital's motion for partial summary judgment[1] and DENIES Wakefield's motion for partial summary judgment[2] as set forth below.

---

[1] State Capital Holdings, LLC's Motion and Memorandum in Support of Motion for Partial Summary Judgment Against All Defendants ("State Capital's Summary Judgment Motion"), docket no. 193, filed March 29, 2013.

[2] Wakefield Kennedy's Motion for Partial Summary Judgment ("Wakefield's Summary Judgment Motion"), docket no. 210, filed April 29, 2013.

# FACTUAL OVERVIEW

Silverleaf owned a note and mortgage (and other related documents) which it contracted to sell to State Capital for $3,100,000.00. Silverleaf and State Capital appointed Metro as escrow agent to hold the Woodland Mall Loan Documents that State Capital was purchasing and the purchase deposits made by State Capital. When the funds and documents were in escrow and other conditions met, the sale was to be closed. Silverleaf, State Capital, and Metro signed a Loan Sale Agreement ("LSA") dated as of December 24, 2009, which governed this transaction. Silverleaf and State Capital amended the LSA three times and finally agreed that the closing would take place on December 31, 2010. At the time of the Third Amendment to the LSA, on or about May 24, 2010, State Capital had placed at least $2,025,000.00 in escrow and the Woodland Mall Loan Documents were in escrow.

In June 2010, right after Silverleaf and State Capital amended the LSA for the third time, Silverleaf pledged the note and mortgage in the Woodland Mall Documents to Wakefield as security for a loan from Wakefield. On June 14, 2010, Silverleaf and Wakefield executed a series of documents memorializing their transaction, including a Note Pledge Agreement and a Collateral Assignment of Loan Sale Agreement and Deposits with an Irrevocable Power of Attorney. Silverleaf, Wakefield, and Metro also entered into a Custody Agreement. In the Wakefield-Silverleaf agreements, Wakefield expressly acknowledged the Silverleaf-State Capital sale, and "acknowledge[d] and agree[d] that the Pledged Note is currently subject to the Purchase Agreement,"[3] and Silverleaf pledged the proceeds of that sale as security for its debt to Wakefield.

---

[3] Note Pledge Agreement, docket no. 231-5, filed May 24, 2013.

State Capital was not party to any agreement with Wakefield. State Capital did not have actual knowledge that Silverleaf pledged the Woodland Mall Loan Documents to Wakefield and did not give Silverleaf permission to pledge the note.

Wakefield and Silverleaf likely contemplated that the proceeds from the Silverleaf-State Capital sale would pay off the Wakefield-Silverleaf loan. The final payment from State Capital for the purchase from Silverleaf of the Woodland Mall Loan Documents was in an amount and due at a time which would have timely paid off the Wakefield-Silverleaf loan.

On December 31, 2010, State Capital caused to be wired to Metro its final payment of $1,091,125.00 which, together with the deposits previously made by State Capital under the LSA, was sufficient to pay the full purchase price under the LSA and amendments. Acting on instructions from Mark Staples, President of Silverleaf's parent company, Silverleaf Financial, LLC, Metro wired the funds directly to Silverleaf.

The Wakefield-Silverleaf Loan remains unpaid. The Court previously granted summary judgment to Wakefield against Silverleaf for the amount due under the Wakefield-Silverleaf loan.[4] Metro interpleaded the Woodland Mall Loan Documents[5] and has deposited them with the Clerk of the Court.[6]

Both State Capital and Wakefield claim entitlement to the Woodland Mall Loan Documents. State Capital's first count seeks specific performance of the LSA and its eighth count seeks a declaratory judgment of priority against Wakefield.[7] Wakefield's eighth count

---

[4] Summary Judgment in Favor of Wakefield Kennedy Against Silverleaf Financial 9, LLC and D. Shane Baldwin, docket no. 205, file April 29, 2013.

[5] Interpleader, docket no. 18, filed October 24, 2012.

[6] Order Authorizing Clerk of the Court to Receive and Hold Documents in Non-Cash Collateral, docket no. 62, filed January 25, 2012.

[7] State Capital Holdings, LLC's Second Amended Complaint, docket no. 256, filed October 23, 2013.

seeks a declaration of priority over State Capital.[8] Both parties move for partial summary judgment on these claims and on Metro's interpleader.[9]

## UNDISPUTED FACTS

1.  Silverleaf and State Capital executed a written agreement in the form of a Loan Sale Agreement dated December 24, 2009 (LSA).[10]

2.  A former employee of Metro National Title Company also mistakenly signed the LSA as "Escrow," and the LSA stated that Metro Title was the "Escrow Holder"; however, Metro Settlement was actually the Escrow Holder under the LSA.[11]

3.  Metro Title only does escrow work on matters concerning real property in Utah, while Metro Settlement only does escrow work on matters concerning real property outside Utah.[12] The LSA documents concern real property in Ohio.[13]

4.  State Capital, Silverleaf, and Metro are parties to the LSA.[14]

5.  The Agreement was made for valuable consideration whereby State Capital was to pay $3,100,000.00 in exchange for being given title to the Woodland Mall Loan Documents (a certain promissory note, mortgage, and other related documents for the Woodland Mall Loan: a

---

[8] Wakefield Kennedy's Amended Complaint, docket no. 124, filed October 24, 2012.

[9] Interpleader, docket no. 18, filed October 24, 2012.

[10] Declaration of Joseph Schwartz ("Schwartz Decl.") ¶¶ 4, 9. docket no. 194, filed March 29, 2013; LSA, docket no. 194-1, filed March 29, 2013.

[11] Declaration of Rodney Newman ("Newman Decl.") ¶¶ 8–11, docket no. 187-3, filed March, 1, 2013. Counsel for State Capital, Metro and Wakefield agreed when the motions were heard on February 3, 2014, that Metro, and not Metro Title, was the true escrow agent. Counsel for Silverleaf did not attend the hearing.

[12] *Id*.

[13] LSA.

[14] LSA; Newman Decl. ¶¶ 8–11.

loan made in February 2007 by Merrill Lynch Mortgage Lending, Inc. to Woodland Mall Holdings, LLC in the principal sum of $8,900,000.00).[15]

6.      Silverleaf, State Capital and Metro agreed that the Woodland Mall Loan Documents would be deposited with a third party, Metro, until State Capital paid all monies due under the LSA.[16]

7.      A written escrow agreement, the LSA, was executed by Silverleaf, State Capital, and Metro.[17]

8.      The LSA appointed Metro to hold the Woodland Mall Loan Documents as escrow agent.[18]

9.      Metro expressly agreed in the LSA to act as "Escrow Holder" under the LSA.[19]

10.      Metro was the escrow agent for the LSA.[20]

11.      Metro agreed to hold certain documents delivered by Silverleaf in escrow.[21]

12.      As escrow agent, Metro was to hold certain documents to be deposited by Silverleaf for the benefit of State Capital pending State Capital's completion of its payment obligation under the LSA, including: (i) the original Note endorsed by Silverleaf to State Capital; (ii) an Assignment and Assumption of Assigned Rights and Obligations executed by Silverleaf; (iii) an assignment of Silverleaf's beneficial interest under the Mortgage and an Assignment of

---

[15] LSA §§ 1.22; 2.1.

[16] LSA § 6.1.

[17] Schwartz Decl. ¶ 9; LSA.

[18] LSA § 6.1.

[19] LSA §§ 1.15, 6.1.

[20] Metro National Title Company's and Metro National Settlement Services, LLC's Memorandum in Opposition to State Capital Holdings, LLC's Motion for Partial Summary Judgment ("Metro's Opposition") 19, docket no. 206, filed April 29, 2013; Custody Agreement § 1, docket no. 124-8, filed October 24, 2012.

[21] LSA § 6.3.

Leases and Rents; and (iv) a UCC-3 statement assigning Silverleaf's security interest in the subject property created pursuant to a UCC-1 to State Capital (or written authorization from Silverleaf pursuant to which State Capital could prepare and file the UCC-3.[22]

13.     Metro agreed to hold certain money delivered by State Capital in escrow.[23]

14.     Pursuant to the LSA, Metro was to receive a fee for acting as escrow agent.[24]

15.     In March 2010, Silverleaf repaid to Wakefield a loan made in December 2009, secured by the Woodland Mall Documents.  At that time, Wakefield sent the Woodland Mall Documents to Metro.[25]

16.     The Woodland Mall Loan Documents were thus in Metro's possession when Metro had the obligation to hold those documents under the Loan Sale Agreement and, under that same agreement, Silverleaf was obliged to place them there.[26]

17.     Under the LSA, Silverleaf was required to deliver the Woodland Mall Loan Documents to Metro, and Metro was to deliver them to State Capital upon completion of State Capital's purchase obligations and closing of the LSA transaction.[27]

18.     Silverleaf and State Capital executed the Third Amendment to the LSA no later than May 25, 2010.[28]

---

[22] LSA § 6.3.

[23] LSA § 6.2.

[24] LSA § 6.5.

[25] Wakefield Kennedy's Memorandum in Opposition to State Capital's Motion for Partial Summary Judgment ("Wakefield Opposition") 2–3, docket no. 207, filed April 29, 2013.

[26] LSA §§ 2.6.

[27] LSA § 6.

[28] Schwartz Decl. ¶ 14.

19.     Thereafter, on June 14, 2010, Silverleaf pledged the Woodland Mall Loan Documents to Wakefield as security for a loan from Wakefield to Silverleaf ("Wakefield Agreement").[29]  The Custody Agreement was executed as part of this transaction.[30]

20.     From at least June 14, 2010, Wakefield had actual knowledge of the LSA, First Amendment, Second Amendment, and Third Amendment.[31]

21.     Wakefield had actual knowledge that the Woodland Mall Loan Documents (the Note and Mortgage) were being held in escrow by Metro in connection with the LSA.[32]

22.     State Capital was not in breach of the LSA on June 14, 2010.[33]

23.     On December 31, 2010, State Capital caused to be wired to Metro the sum of $1,091,125.00 as required under the LSA and amendments thereto.[34]

24.     That sum was to be held by Metro for the benefit of State Capital pending closing of the LSA transaction.[35]

25.     State Capital fully paid amounts due under the LSA on December 31, 2010.[36]

26.     Silverleaf was obligated to deliver the Woodland Mall Loan Documents to State Capital at closing upon full payment by State Capital:

> Seller agrees to send to Buyer or Buyer's designee on or immediately after the Closing Date, at Buyer's instruction each original Collateral Document

---

[29] Wakefield Am. Compl. ¶ 19, docket no. 124, filed October 24, 2012; Wakefield Opposition 10.

[30] Custody Agreement ¶ 1, docket no. 124-8, filed October 24, 2012.

[31] *Id.*; Wakefield Opposition 10; Note Pledge Agreement between Wakefield and Silverleaf, Recitals C and D, docket no. 124-3, filed October 24, 2012; Collateral Assignment of Loan Sale Agreement and Deposits with an Irrevocable Power of Attorney ¶ 2, docket no. 124-5, filed October 24, 2012.

[32] Custody Agreement ¶ 1.

[33] Schwartz Decl. ¶ 28; Wakefield Opposition 11.

[34] Schwartz Decl. ¶ 23; Rimberg Decl. ¶ 9; Wire transfer confirmation, docket no. 195-7, filed March 29, 2013; Wire transfer receipt, docket no. 195-8, filed March 29, 2013; Escrow summary, docket no. 195-9, filed March 29, 2013.

[35] Schwartz Decl. ¶ 13.

[36] Schwartz Decl. ¶ 23; Deposition of D. Shane Baldwin ("Baldwin Dep.") 36:11–14; 158:18–159:3, docket no. 195-11, filed March 29, 2013; Wakefield Opposition 12.

and Loan Document in Seller's and/or its agent's and/or representative's possession, including all Deleted Documents, affecting the Loan. This provision shall survive the Closing.[37]

27.     Metro, as escrow agent, was obligated to deliver the Woodland Mall Loan Documents to State Capital at closing upon full performance by State Capital.[38]

28.     Silverleaf and Metro did not release the Woodland Mall Loan Documents to State Capital upon full payment by State Capital.[39]

29.     Metro did not deliver the Woodland Mall Loan Documents to State Capital.[40]

30.     State Capital has paid over $3,100,000.00 to purchase the Woodland Mall Loan Documents but has not received delivery of the Woodland Mall Loan Documents.[41]

31.     Metro released the deposits paid by State Capital to Silverleaf.[42]

32.     On January 4, 2011, Mark Staples as president of Silverleaf sent wire instructions to Madison VanTreese, an employee of Metro directing her to "wire funds being held on account for SilverLeaf Financial 9, LLC" to an account in the name of Silverleaf Financial 9 at Zions Bank.[43]

33.     On January 18, 2011, Metro caused $1,091,125.00 to be wire transferred to Silverleaf's bank account at Mr. Staples' direction.[44]

34.     Ms. VanTreese did not receive instruction from State Capital or from anyone at the Metro entities regarding the release of funds to Silverleaf.[45]

---

[37] LSA § 6.4. *See also* LSA § 2.1.

[38] LSA §§ 1.14, 1.15, 2.6, 6.4.

[39] Schwartz Decl. ¶ 25.

[40] Schwartz Decl. ¶ 26.

[41] Schwartz Decl. ¶¶ 11, 17, 20, 23, 26.

[42] Escrow summary, docket no. 195-9, filed March 29, 2013.

[43] Email from Staples to VanTreese, docket no. 195-14, filed March 29, 2013.

[44] Metro Opposition 17; Escrow summary, docket no. 195-9, filed March 29, 2013.

35.     Metro Title and Metro Settlement were not provided any instruction by State Capital to release $1,091,125.00 of funds to Silverleaf.[46]

36.     Ms. VanTreese did not provide State Capital with the Woodland Mall Loan Documents.[47]

37.     Metro appointed an inexperienced employee (Madison VanTreese) to handle the escrow file after the former escrow officer, Claudeen Sutherland, was dismissed.[48]

38.     Ms. VanTreese had no experience in a commercial escrow transaction involving documents.[49]

39.     Metro has interpleaded[50] the Note and related documents.

40.     The Woodland Mall Loan is uniquely identifiable property for which money damages would not suffice.[51]

41.     The borrower under the Woodland Mall Loan Documents was in default, providing the owner of such loan the ability to foreclose on such property.[52]

42.     The LSA provides in Section 11.11 that "This Agreement shall be construed, and the rights and obligations of the Seller and the Buyer hereunder determined, in accordance with the local law of the State of New York[53]

---

[45] Schwartz Decl. ¶ 36; VanTreese Deposition ("VanTreese Dep.") 53:10–54:10, docket no. 195-15, filed March 29, 2013.

[46] Schwartz Decl. ¶ 36.

[47] Schwartz Decl. ¶ 26.

[48] VanTreese Dep. 7:16–18; 10:4–24; 21:21–24; 22:1–9; 94:3–5.

[49] VanTreese Dep. 91:25–92:3.

[50] Interpleader, docket no. 18, filed October 24, 2012.

[51] Schwartz Decl. ¶ 35.

[52] *Id*.

[53] LSA § 11.11.

**<u>DISCUSSION</u>**

The granting of a motion for summary judgment is appropriate when a movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] Said otherwise, "[s]ummary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[55] "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[56]

The LSA is governed by the laws of New York.[57] A court sitting in diversity must apply the forum state's choice of law provision in determining whether a contractual choice of law provision applies. There is a reasonable basis to apply such jurisdiction's law when a party's "principle [sic] place of business is" in such jurisdiction.[58] State Capital's principal place of business is in New York.[59]

It is undisputed that State Capital fully paid amounts due on its obligations under the LSA by paying $3,100,000.00 by December 31, 2010. Further, the Woodland Mall Loan Documents are unique and specific property. State Capital is therefore entitled to specific performance of the LSA and delivery of the Woodland Mall Loan Documents.[60] On account of

---

[54] Fed. R. Civ. P. 56(a).

[55] *Reeder v. Wasatch County School Dist.*, 359 Fed.Appx. 920, 921 (10th Cir. 2009) (unpublished) (internal citations and quotations omitted).

[56] *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).

[57] LSA § 11.11.

[58] *Shearson Lehman Bros., Inc. v. M & L Investments*, 10 F.3d 1510, 1514 (10th Cir. 1993).

[59] Schwartz Decl. ¶ 3.

[60] *Coizza v. 164-50 Crossbay Realty Corp.*, 900 N.Y.S.2d 416, 420 (N.Y. App. Div. 2010); *Madison Investments, Inc. v. Cohoes Associates*, 574 N.Y.S.2d 980, 981–82 (N.Y. App. Div 1991); *Bregman v. Meehan*, 479 N.Y.S.2d 422 (N.Y. Sup. Ct. 1984).

Wakefield's competing claim, Metro did not deliver the Woodland Mall Loan Documents to State Capital as it was obligated to do under the LSA.[61]  Metro instead interpleaded the Woodland Mall Loan Documents.[62]  Wakefield's claim is subordinate to State Capital's rights and State Capital is entitled to delivery of the Woodland Mall Loan Documents.

The purpose for State Capital and Silverleaf putting the monies paid by Silverleaf as well as the Woodland Mall Loan Documents into escrow pending the closing was so that each party could have the peace of mind that they would get the benefit of their bargain at closing unless a stated contingency occurred.[63]  No later than March 2010, when the Woodland Mall Loan Documents were in Metro's possession in escrow and Silverleaf's December 2009 obligation to Wakefield was fully paid, Silverleaf lost "control over the instruments"[64] and State Capital became the equitable owner of them by virtue of the LSA.[65]  After the Woodland Mall Loan Documents were in the LSA escrow, Silverleaf lost the ability to grant to a third party any rights superior to State Capital's.

Wakefield knew that its rights were subordinate to State Capital when it made the Wakefield-Silverleaf loan and structured the transaction around the Silverleaf-State Capital sale. The plain language of the Wakefield-Silverleaf loan documents show that the transaction was structured so that Wakefield expected to be paid from the proceeds of the Silverleaf-State Capital sale.  If State Capital did not make its payment, Wakefield would be entitled to take possession of the Woodland Mall Loan Documents.  Wakefield expressly acknowledged in its loan

---

[61] LSA; First Amendment to LSA, docket no. 194-2, filed March 29, 2013; Second Amendment to LSA, docket no. 194-3, filed March 29, 2013; Third Amendment to LSA, docket no. 194-4, filed March 29, 2013.

[62] Interpleader, docket no. 18, filed August 26, 2011.

[63] *Williams v. C.I.R.*, 1 F.3d 502, 506 (7th Cir.1993).

[64] *99 Commercial Street, Inc. v. Goldberg*, 811 F.Supp. 900, 906 (S.D.N.Y. 1993); *Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 667 (S.D.N.Y. 1985) (citing 28 Am. Jur. 2d *Escrow* § 10 (1964)).

[65] *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 710 (S.D.N.Y. 1992).

documents with Silverleaf that Wakefield's rights to the Woodland Mall Loan Documents are

contingent and subject to (meaning secondary to) the LSA and State Capital's equitable interest.

The clear construction of the Custody Agreement between Wakefield and Metro provides that:

> The Pledged Note is <u>currently subject to</u> that certain Loan Sale Agreement
> with State Capital Holdings, LLC, a New York limited liability company
> (the "Purchaser") dated as of December 24, 2009, as amended by that
> certain First Amendment to Loan Sale Agreement dated February 5, 2010,
> that certain Second Amendment to Loan Sale Agreement dated March 18,
> 2010 and that certain Third Amendment to Loan Sale Agreement dated
> May 24, 2010 (the "Loan Sale Agreement"). Custodian is acting as escrow
> agent in connection with the Loan Sale Agreement and has possession of
> the Pledged Note and will continue to hold the Pledged Note on Lender's
> behalf. [66]

The Custody Agreement, in paragraph 2(b), references a Note Pledge Agreement

between Wakefield and Silverleaf.[67]  In the Note Pledge Agreement, Wakefield acknowledged

State Capital's interest in the Note Pledge Agreement between Wakefield and Silverleaf:

> C. Borrower [Silverleaf] has entered into that certain Loan Sale
> Agreement with State Capital Holdings, LLC, a New York limited liability
> company (the "Purchaser") dated as of December 24, 2009, as amended
> by that certain First Amendment to Loan Sale Agreement dated February
> 5, 2010, that certain Second Amendment to Loan Sale Agreement dated
> March 18, 2010 and that certain Third Amendment to Loan Sale
> Agreement dated May 25, 2010 (collectively, the Loan Sale Agreement),
> pursuant to which Borrower has agreed to sell the Pledged Note to the
> Purchaser.
>
> D. As partial security for the repayment of the Loan, Borrower has agreed
> to pledge to Lender [Wakefield] all of Borrower's <u>right title and interest in
> and to the Pledged Note</u> . . . .[68]

---

[66] Custody Agreement ¶ 1 (emphasis added).

[67] Note Pledge Agreement.

[68] *Id.*

Because Silverleaf's right, title, and interest in the Woodland Mall Loan Documents was limited by State Capital's equitable ownership of the same, a Collateral Assignment of Loan Sale Agreement and Deposits with an Irrevocable Power of Attorney ("Collateral Assignment") between Wakefield and Silverleaf[69] was executed. Pursuant to the Collateral Assignment, Silverleaf limited the rights it assigned to Wakefield because in Paragraph 3(d):

> [T]he [Loan Sale Agreement between Silverleaf and State Capital] constitutes and will constitute the valid and binding obligation of Assignor [Silverleaf] and is and will be enforceable against Assignor [Silverleaf] and the Purchaser [State Capital] in accordance with its terms.

Further, paragraph 3(f) of the same document states that:

> [A]ll covenants, conditions, and agreements required to be performed by Assignor [Silverleaf] will be performed as required by the [Loan Sale Agreement between Silverleaf and State Capital].

Paragraph 4 of the Collateral Assignment provides that:

> Assignor hereby does agree to promptly perform any and all obligations it may have under the [Loan Sale Agreement with State Capital] as and when required by the Sale Agreement and applicable laws . . . .

The UCC-1 filed by Wakefield provides that Wakefield has a security interest in:

> All of debtor's right, title and interest in and to the Pledged Note [Woodland Mall Loan Note] pursuant to and secured by the Note Pledge Agreement between debtor and secured party dated June 14, 2010, including all payments made thereunder and all proceeds thereof and the mortgage securing the Pledged Note and other related loan documents pursuant to and secured by the Assignment of Open-End Mortgage and Related Loan Documents for Security Purposes Between Debtor and Secured Party dated June 14, 2010.

The above referenced agreements and documents, all drafted by Wakefield, make clear that Wakefield could only acquire rights that Silverleaf had in the Woodland Mall Loan Documents

---

[69] Collateral Assignment of Loan Sale Agreement and Deposits with an Irrevocable Power of Attorney, docket no. 124-5, filed October 24, 2012 (emphasis added).

subject to State Capital's interest in the Woodland Mall Loan Documents. Further, Wakefield specifically required Silverleaf to perform by delivering the Woodland Mall Loan Documents to State Capital upon payment in full.

Wakefield's argument that the Woodland Mall Loan Documents were not being held in escrow for State Capital at the time the Wakefield-Silverleaf loan was made is meritless. Wakefield and Metro agreed in the Custody Agreement that "[t]he parties acknowledge that Borrower has delivered the Pledged Note to Custodian to hold until the closing of the transaction referenced in the Loan Sale Agreement."[70] Wakefield also admits that Wakefield itself sent the Woodland Mall Loan Documents to Metro in relation to a previous loan it made to Silverleaf that was paid in full in March 2010.[71] While Wakefield argues that Metro was simply warehousing the Woodland Mall Loan Documents until the Wakefield-Silverleaf loan was made in June 2010, there is no evidence to support this assertion, which is inconsistent with the Custody Agreement drafted by Wakefield. Moreover, from the time that Wakefield was paid in full by Silverleaf in March 2010 through delivery of the Woodland Mall Loan Documents into escrow with Metro pursuant to the LSA, there was no obligation owing from Silverleaf to Wakefield which might have been secured by the Woodland Mall Loan Documents. In the time period from March 2010 through June 2010, the only reason for Metro to have the Woodland Mall Loan Documents was to fulfil the LSA.

Wakefield relies on a letter from Laura Karassik,[72] an attorney for Wakefield, to Metro, to support its incorrect argument that Metro was not holding the Woodland Mall Loan

---

[70] Custody Agreement. ¶ 2(b).

[71] Wakefield Opposition 3.

[72] Letter Dated Jan. 28, 2010 From Laura Karassik to Claudeen Sutherland, docket no. 208-3, filed April 29, 2013.

Documents for State Capital but was instead gratuitously maintaining possession of them.[73]  The Karassik letter does not support such an argument and Karassik's testimony is wholly conclusory.  Additionally, Karassik's testimony that Wakefield received an opinion of Silverleaf's counsel that represented and warranted that Metro had the power and authority to take possession of the Woodland Mall Loan Documents is also unsupported.[74]  The only representations that were made by Silverleaf's counsel were that the Wakefield-Silverleaf loan would not "constitute a default or provide a basis for acceleration of indebtedness under any agreement or restriction" and that there is no litigation pending or threatened against Silverleaf, Silverleaf Financial, LLC, or D. Shane Baldwin.[75]  Even if made, such a representation would not be binding on State Capital, which had no knowledge of the Wakefield-Silverleaf loan.

Wakefield is incorrect in arguing that State Capital must "produce admissible evidence that Wakefield did not have possession of the Note."[76]  The burden is on Wakefield to prove its possession.  And several facts establish that Wakefield's conclusory arguments are incorrect.

Metro admits that it was holding the Woodland Mall Loan Documents for the benefit of State Capital.[77]  As noted above, the Custody Agreement drafted and signed by Wakefield explicitly states that Metro was holding the Woodland Mall Loan Documents for State Capital in accordance with the LSA.[78]  That possession by Metro for State Capital in accordance with the

---

[73] Declaration of Laura Karassik ¶¶ 8-9, docket no. 208, filed April 29, 2013.

[74] *Id*. at ¶ 9.

[75] Letter Dated June 1, 2012, From Heston H. Nielson to Wakefield Kennedy, LLC, docket no. 209-1, filed April 29, 2013.

[76] Wakefield's Reply in Support of Motion for Summary Judgment 3, docket no. 238, filed June 17, 2013.

[77] Metro Opposition 11.  This fact was also admitted by Metro at the hearing of this motion on February 3, 2014.

[78] Custody Agreement ¶ 1.

LSA is inconsistent with any possession of the Note by Wakefield. This constitutes evidence that prior to June 14, 2010, and thereafter, Wakefield did not have possession of the Note.

Wakefield relies on the Custody Agreement in erroneously arguing that Wakefield had possession of the Woodland Mall Loan Documents to the exclusion of State Capital.[79] Paragraph 2(b) of the Custody Agreement can only be interpreted one way: that Metro was *already* holding the Woodland Mall Loan Documents in escrow for State Capital under the Agreement when Silverleaf pledged the Woodland Mall Loan Documents to Wakefield.

Wakefield's filing of a UCC-1 does not give Wakefield priority over State Capital. Both Utah's Uniform Commercial Code, Utah Code § 70A-9a-330(4), and Section 9-330 of New York's Uniform Commercial Code provide that "a purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party." Wakefield could not and did not have possession of the Woodland Mall Loan Documents when Silverleaf placed them into escrow prior to Wakefield's June 2010 loan to Silverleaf. State Capital is the purchaser of the Woodland Mall Loan Documents, including the instrument represented by the Note. State Capital gave value for such purchase in the amount of $2,025,000.00 prior to Wakefield filing a UCC-1. State Capital acted "in good faith and without knowledge that its purchase violates the rights of a secured party" because there was no other secured party at the time that the Woodland Mall Loan Documents were delivered into escrow for State Capital's benefit. Wakefield's claimed security interest, on the other hand, arose *after* State Capital and Silverleaf entered into the LSA,

---

[79] Wakefield Opposition 24.

amended the same three times, and after both State Capital and Silverleaf had deposits made into escrow.

Wakefield misinterprets § 330(4) and argues that § 330(4) grants a *security interest* and that a party relying on § 330(4) must also abide by §§ 309 and 203 which would require a security agreement. Wakefield is incorrect as § 330(4) does not grant an actual security interest but rather grants a *purchaser* of an instrument (such as State Capital as purchaser of the Note) *priority* over a *security interest* created by § 304(d). Wakefield's argument that State Capital did not have a security interest is therefore irrelevant.[80]

Wakefield's argument that it has a valid possession-perfected security interest and therefore has priority is also incorrect.[81] First, as explained above, Wakefield took whatever security interest it claims *subject to* State Capital's right to delivery of the Woodland Mall Loan upon paying for the same in full. Second, in arguing that it obtained a security interest by taking possession under the Custody Agreement, Wakefield fails to acknowledge that Metro had possession of the Woodland Mall Loan Documents free of any claim of Wakefield from March 2010, well before the June 2010 Custody Agreement. When the Wakefield-Silverleaf obligation was paid off in March 2010, the Woodland Mall Loan Documents were, as Silverleaf promised, in escrow for State Capital's benefit. Silverleaf demonstrated a "relinquishment of any right of possession and control of the property"[82] and could not have given a right of possession to anyone else, including Wakefield. Because Silverleaf already had relinquished possession through the escrow established in the LSA, Wakefield could not have taken possession in any

---

[80] Wakefield Opposition 33–34.

[81] Wakefield Opposition 34.

[82] *National Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn*, 634 N.Y.S.2d 609, 614 (N.Y. Sup. Ct. 1994).

meaningful way, regardless of its agreements with Silverleaf and Metro.  Even if Wakefield and State Capital shared possession, State Capital already had an established priority that Wakefield recognized, and State Capital did not give up its possession to Wakefield.

Wakefield makes numerous inaccurate arguments in its motion for partial summary judgment.[83]  That motion relies entirely on its opposition to State Capital's motion for partial summary judgment.[84]  Wakefield incorrectly argues, relying on Section 5.1 of the LSA, that Silverleaf was not required to have possession of the Note at closing of the LSA and, relying on Sections 2.4 and 2.6, that Silverleaf was not required to deposit the Note into escrow prior to closing.[85]  Wakefield ignores Section 6.2(d) of the LSA, which unconditionally required Silverleaf to deposit into escrow "the original Loan Note endorsed to the order of" State Capital prior to closing.[86]  Further, once the deposit into escrow occurred, State Capital had no obligation to relinquish its possessory rights created by the escrow until closing of the sale of the Woodland Mall Loan Documents under the LSA.

Wakefield also relies on Sections 2.1 and 2.2 of the LSA to argue that the LSA itself did not transfer title to State Capital until the closing of the Agreement.[87] Wakefield ignores that Silverleaf gave State Capital an equitable interest in the Note by depositing the Note into escrow pursuant to the LSA.  The equitable interest given by Silverleaf was that "upon full performance of the conditions according to the escrow agreement, title will vest at once in" State Capital.[88]

---

[83] Wakefield's Summary Judgment Motion, docket no. 210, filed April 29, 2013.

[84] Wakefield Opposition, docket no. 207, filed April 29, 2013.

[85] Wakefield Opposition 20.

[86] LSA § 6.2(d).

[87] Wakefield Opposition 21.

[88] *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 710 (S.D.N.Y. 1992); *see also West v. Case*, 142 P.3d 576, 580 (Utah Ct. App. 2006).

Wakefield incorrectly argues that Section 4.2 of the LSA represents a mutual intent and understanding of Silverleaf and State Capital that Silverleaf's ownership interest in the Note might be encumbered and not transferrable to State Capital prior to and even upon Closing.[89] Wakefield ignores that in the preceding section, Section 4.1, the LSA provides that:

> Seller [Silverleaf] hereby represents and warrants as of the date hereof and as of the Closing Date, that
> * * *
> (b) Seller is presently the sole owner and beneficiary under all of the Loan Documents[.]

Thus, Silverleaf represented in the LSA that it was and would be the sole owner *and* beneficiary of the Woodland Mall Loan at closing. Wakefield also incorrectly argues that Section 4.1 of the LSA states that the parties did not intend the Note to be free from encumbrance at closing.[90] Wakefield ignores that Section 4.1 of the LSA prohibits Silverleaf from entering into any transaction whereby someone other than Silverleaf would be the owner or beneficiary of the Woodland Mall Loan at the time of closing. Entering into a security agreement without payment of the loan covered by the security agreement prior to closing of the LSA transactions (and defaulting so as to permit the secured creditor to conduct a secured party sale of the Woodland Mall Loan Documents that could result in transfer of Silverleaf's rights to those documents away from Silverleaf) is precisely such a transaction prohibited by the LSA.

Wakefield incorrectly argues that Metro took possession of the Note as Custodian for Wakefield in June 2010, and had possession for Wakefield at all times thereafter.[91] The Custody Agreement, as explained above, states in Section 2(b) that Metro was holding the Woodland Mall Loan Documents in connection with the LSA, First Amendment, Second Amendment, and

---

[89] Wakefield Opposition 21–22.

[90] Wakefield Opposition 21–22.

[91] Wakefield Opposition 21–24.

Third Amendment. The Custody Agreement merely permitted Metro to continue holding (without State Capital's consent) the Woodland Mall Loan Documents in the event that (i) State Capital defaulted on its Agreement with Silverleaf and (ii) Silverleaf did not pay off the Second Wakefield Loan. The Custody Agreement's terms provide that Metro "will continue to hold the Pledged Note on Lender's behalf" *only if State Capital is not entitled to delivery*. Wakefield also ignores that the agreement is referred to as a "custody" agreement and not as an "escrow" agreement. The document is called a "custody" agreement because the Woodland Mall Loan Documents were already being held in escrow for State Capital and the Custody Agreement could only provide that Metro would simultaneously retain custody of the Woodland Mall Loan Documents subject to the closing of the LSA.

Final judgment will be entered in favor of State Capital on the following:

a.     the first count of State Capital's Second Amended Complaint[92] for specific performance of the Loan Sale Agreement and the three amendments thereto;

b.     the eighth count of State Capital's Second Amended Complaint for a declaratory judgment of priority against Wakefield;

c.     the complaint in interpleader, in favor of State Capital;[93] and

d.     the eighth count of Wakefield's Amended Complaint which seeks a declaration of Wakefield's priority over State Capital.[94]

Pursuant to Fed. R. Civ. P. 54(b),,there is no just reason for delay in entering final judgment prior to a determination of all claims in this action. To the contrary, it is necessary to release

---

[92] Docket no. 256, filed October 23, 2013.

[93] Docket no. 18, filed August 26, 2011.

[94] Docket no. 124, filed October 24, 2012.

these documents so that the intended sale can be completed, and the Woodland Mall Loan can be administered.

## **ORDER**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that State Capital's Motion for Partial Summary Judgment[95] is GRANTED as to:

e.      the first count of State Capital's Second Amended Complaint[96] for specific performance of the Loan Sale Agreement and the three amendments thereto;

f.      the eighth count of State Capital's Second Amended Complaint for a declaratory judgment of priority against Wakefield;

g.      the complaint in interpleader, in favor of State Capital;[97] and

h.      the eighth count of Wakefield's Amended Complaint which seeks a declaration of Wakefield's priority over State Capital.[98]

IT IS FURTHER ORDERED that Wakefield's motion for partial summary judgment[99] is DENIED.

IT IS FURTHER ORDERED that the Clerk shall enter the Judgment of the Court pursuant to Fed.R.Civ.P. 58.

---

[95] State Capital Holdings, LLC's Motion and Memorandum in Support of Motion for Partial Summary Judgment against All Defendants, docket no. 193, filed March 29, 2013.

[96] Docket no. 256, filed October 23, 2013.

[97] Docket no. 18, filed August 26, 2011.

[98] Docket no. 124, filed October 24, 2012.

[99] Wakefield Kennedy's Motion for Partial Summary Judgment, docket no. 210, filed April 29, 2013.

IT IS FURTHER ORDERED that the Clerk of the Court, no sooner than fourteen days after entry of judgment, release the Woodland Mall Loan Documents[100] to State Capital.

Dated March 6, 2014.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[100] Order Authorizing Clerk of the Court to Receive and Hold Documents in Non-Cash Collateral, docket no. 62, filed January 25, 2012.